```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
ABBEY HOUSE MEDIA, INC., d/b/a          :
BOOKSONBOARD,                           :
                                        :      14cv2000 (DLC)
                     Plaintiff,         :
                                        :      OPINION & ORDER
          -v-                           :
                                        :
APPLE INC.; HACHETTE BOOK GROUP, INC.;  :
HARPERCOLLINS PUBLISHERS, LLC,;         :
VERLAGSGRUPPE GEORG VON HOLTZBRINCK     :
GHBH; HOLTZBRINCK PUBLISHERS, LLC,      :
d/b/a MACMILLAN; THE PENGUIN GROUP, A   :
DIVISION OF PEARSON PLC; and S&S, INC.,:
                                        :
                     Defendants.        :
                                        :
----------------------------------------X
```

APPEARANCES

For Plaintiff Abbey House Media, Inc.:
Maxwell M. Blecher
Jordan L. Ludwig
Blecher Collins Pepperman & Joy P.C.
515 Figueroa St., Suite 1759
Los Angeles, CA 90071

Eric M. Creizman
Creizman PLLC
565 Fifth Ave., 7th Floor
New York, NY 10012

For Defendant Simon & Schuster, Inc.:
Yehuda Lev Buchweitz
James W. Quinn
Jeffrey Leonard White
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, NY 10153

For Defendant The Penguin Group:
Amanda Christine Croushore
Saul P. Morganstern
Kaye Scholer LLP
425 Park Ave.
New York, NY 10022

DENISE COTE, District Judge:

Plaintiff Abbey House Media, Inc. ("Abbey House"), d/b/a/ BooksOnBoard, has brought antitrust claims against Apple, Inc. ("Apple") and five publishing companies, including defendants Simon & Schuster, Inc. ("S&S") and Penguin Group ("Penguin"). In response, S&S and Penguin filed counterclaims against Abbey House alleging copyright infringement and breach of contract. In this Opinion, the motion to dismiss the counterclaims is granted in part.

## BACKGROUND

The following facts are asserted in the counterclaims and taken from documents integral to those claims unless otherwise noted. S&S and Penguin each had an agreement with Abbey House to act as its agent in the sale of e-books. S&S's agreement is dated August 24, 2010 ("S&S Contract"). The Penguin contract is dated May 19, 2010 ("Penguin Contract").

While the terms of the S&S Contract and the Penguin Contract differ in some respects, they are structured identically. As an agent for the Publisher, Abbey House is given responsibility for selling e-books and providing customer service to consumers. Abbey House was paid a commission for each e-book sold. Each contract also included a third party, the Digital Fulfillment Provider ("DFP"). The DFP was appointed by the publisher, but engaged by Abbey House, who was responsible for paying the fees

of the DFP.  In both contracts, the DFP was responsible for providing Digital Rights Management ("DRM") protection.  DRM protection essentially works as a lock, restricting the manner in which digital files can be viewed and copied.  DRM protection is commonly used on e-books and other digital files to prevent the unlawful copying and distribution of copyrighted material.

Under the terms of the S&S Contract, Abbey House was responsible for ensuring that e-book purchasers agreed to abide by content usage rules that permit only personal, noncommercial use.  The contract states, in relevant part:

> Agent will be responsible for . . . [conditioning] purchase and use of Publisher Works on a Customer's express agreement to Agent's content usage rules on its site which shall provide, among other things, that any use of Publisher Works is for <u>personal and noncommercial use only</u> . . . .  All content usage rules and others statements of the terms of sale or other disclosures provided to customers shall be consistent with the terms of this Agreement.

(Emphasis added.)  The preamble to the contract provided that S&S's e-books were to be sold solely for "personal . . . use without any time-based limitations."

To ensure that the e-books were not subject to unauthorized uses, the DFP was required to implement security measures:

> [The DFP] shall implement such encryption and other measures as are necessary to ensure that Publisher works are secure from theft, <u>unauthorized copying or retransmission</u>, printing, infringement, unauthorized manipulation, or <u>any other misappropriation</u> ("Misappropriation") and shall transmit Publisher Works only in encrypted form.
> . . .
> [The DFP] shall utilize DRM, encryption, and/or

> security technology approved by [S&S] . . . to secure
> Publisher Works from Misappropriation. . .

(Emphasis added.)  In the event that Abbey House became aware that any of S&S's works had been subject to "misappropriation" due to a breach of the security measures, including DRM protection, Abbey House was required to "promptly inform" S&S publisher of the breach.  All disclosures to customers were to be "consistent with the terms of the" contract.

Under the terms of the Penguin Contract, Abbey House was responsible for ensuring that the purchase and use of e-books was conditioned on a user's "express agreement to the Content Usage Rules."  The Content Usage Rules provide that e-books may be used "solely for purchaser's personal and noncommercial use."  To ensure that e-books were used solely for personal, noncommercial use, the contract provided that the DFP would use "commercially reasonable efforts to apply DRM to prevent End Users from printing, copying, or pasting [Penguin] Content or forwarding an e-book to a third party."  The DFP was required to "immediately notify" Penguin if it became aware of "any unauthorized or improper use," including "the unauthorized downloading of eBooks by an End User or third part."  The Content Usage Rules also provide that end users acquiring e-books may "use eBooks on up to six (6) transfer devices and an unlimited number of Non-Transfer Devices at the same time; or as allowed by then current publisher approved DRMs supported by the Digital Fulfillment Provider."

4

Abbey House's e-book store, BooksOnBoard, ceased all retail operations on April 6, 2013.  Other operations and support ceased on April 30.  Before ceasing operations, Abbey House posted an announcement on its website ("the Announcement").  The Announcement advised customers that they can download their e-books onto their new reading devices by stripping DRM protection using information and tools that are available on the Internet so long as they are doing so "for personal use" of the e-books.

The Announcement reads in relevant part:

> \*\* BooksOnBoard ceased all retail operations on April 6, 2013 \*\*
>
> All support and other operations ceased April 30, 2013.  There are no longer any employees with the company.
>
> Getting access to your downloaded books <u>if you change reading devices</u>: for those of you who downloaded your books to your PCs or Macs, <u>you can strip DRM from your books</u> after which you will be able to readily port them from device to device through drag and drop or other means, without the need for further downloads.  There is a great deal of information online about stripping DRM.  (Please be sure to make backup copies of your eBook files in a separate directory before stripping in the event anything goes wrong in your first attempts.)  <u>Many of our customers are using Calibre or other tools to strip DRM</u> from their downloaded eBooks <u>in order to have them available indefinitely should they change reading devices</u>.  Many argue that this is a legitimate use as long as this is being done for personal use of eBooks purchased, not for piracy.  We are told this is in the spirit of the eBook license and that it is common practice.
>
> If you downloaded directly to iPhones or iPads, there are software programs available that can allow you to port files from those devices to another device.  In the late summer of 2013, Adobe had a breach so you may need to go to Adobe and reset your credentials.

All of this information is available by online search. (Emphasis added.)

S&S and Penguin allege that Abbey House was aware that some users were using Calibre or other tools to strip DRM protection. On message boards on the Internet, some of Abbey House's customers responded to the Announcement. One user stated: "Just downloaded all my books . . . And removed the DRM (again) just in case." Another user posted that "[m]ost of my books from Books on Board are downloaded, de-drm'd and backed up . . . ."

S&S and Penguin each assert that some of their e-books were stripped of DRM protection. S&S asserts that "S&S e-books from which DRM protection was stripped were copied, in violation of copyrights held by authors published by S&S." Penguin alleges that "Penguin e-books from which DRM protection was stripped were distributed freely to other consumers . . . ." But, neither S&S nor Penguin identifies a specific title for which this occurred.

## PROCEDURAL HISTORY

This action is related to other antitrust litigation pending before this Court. In 2011 and 2012, the U.S. Department of Justice, many states, and a class of consumers sued Apple and the five publishers ("Publishers") in a series of cases that alleged a conspiracy to fix prices and reduce competition in the e-book market. Each of the Publishers settled those lawsuits. Apple was found liable for a per se violation of federal and state

antitrust laws following a trial in June 2013.  United States v. Apple Inc., 952 F. Supp. 2d 638 (S.D.N.Y. 2013).  On the eve of a damages trial, Apple settled the damages claims brought by the class and states.  Apple has appealed the finding of liability.

Three e-book distributors filed lawsuits against Apple and the Publishers in 2013 and 2014, alleging that they were also harmed by the e-book price-fixing conspiracy.  DNAML Pty, Ltd. filed its complaint ("DNAML Complaint") on September 16, 2013; Lahovo, LLC ("Lahovo") filed a complaint on March 14, 2014; and Abbey House filed its complaint on March 21, 2014.  On June 5, a motion to dismiss the DNAML Complaint was granted in part.  DNAML Pty., Ltd. v. Apple, Inc., 13cv6516 (DLC), 2014 WL 2535113 (S.D.N.Y. June 5, 2014).  On June 20, Lahovo and Abbey House stipulated that the June 5 decision would apply, with one exception, to the Abbey House and Lahovo actions as well.[1]

On July 21, S&S and Penguin responded to the Abbey House complaint.  Both brought a counterclaim against Abbey House based on BooksOnBoard's website Announcement discussing the removal of DRM protection from e-books.  S&S and Penguin allege contributory copyright infringement and breach of contract.  On September 9, Abbey House filed a motion to dismiss the counterclaims.  S&S and Penguin opposed the motion in a consolidated brief.  The motion was fully briefed on October 3.

---

[1] The plaintiffs reserved the right to argue that claims arising from sales between the United States and foreign countries were

**DISCUSSION**

When deciding a motion to dismiss under Rule 12(b)(6), Fed. R. Civ. P., a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." LaFaro v. New York Cardiothoracic Group, PLLC, 570 F.3d 471, 475 (2d Cir. 2009). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). A complaint must do more, however, than offer "naked assertions devoid of further factual enhancement." Id. (citation omitted). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." Id.

At the pleading stage, intent and knowledge may be alleged generally. Fed. R. Civ. P. 9. While "factual allegations of a complaint are normally accepted as true on a motion to dismiss, that principle does not apply to general allegations that are contradicted by more specific allegations in the Complaint." DPWN Holdings (USA), Inc. v. United Air Lines, Inc., 747 F.3d 145, 151-52 (2d Cir. 2014) (citation omitted). General allegations of intent, or the lack thereof, may be contradicted by specific allegations in a complaint. Id. at 152.

"For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an

---

not barred by the June 5 decision.

exhibit or any statements or documents incorporated in it by reference, as well as . . . documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) (citation omitted). The S&S Contract and Penguin Contract were relied upon by the S&S and Penguin in bringing this action, and the terms of those contracts are relied upon to resolve this motion.

Abbey House has moved to dismiss both of the claims asserted against it. Each counterclaim will be considered in turn.

**I. Copyright Infringement**

S&S and Penguin argue that Abbey House is liable for copyright infringement either as a contributory infringer or for inducement of infringement. Their claims arise from the assertion that the Announcement led users to remove the DRM protection from e-books, and some users who removed the DRM protection then copied and distributed these e-books. The facts alleged in the complaint are insufficient to plead either contributory infringement or inducement of infringement.

**A. Contributory Infringement**

"[T]here can be no contributory infringement absent actual infringement . . . ." Faulkner v. Nat'l Geographic Enterprises Inc., 409 F.3d 26, 40 (2d Cir. 2005). To prevail on a claim of copyright infringement, two elements must be proven. First, the plaintiff must prove ownership of a valid copyright. Second, the

plaintiff must prove that the defendant copied or displayed "constituent elements of the work that are original" in violation of one of the exclusive rights granted by 17 U.S.C. § 106. Arista Records v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citation omitted). Among the exclusive rights granted by § 106 are the rights to reproduce and to distribute copyrighted works. 17 U.S.C. § 106.

Under common law tort principles, a defendant is liable for contributory copyright infringement if, "with knowledge of the infringing activity, [the defendant] . . . materially contributes to the infringing conduct of another." Artista Records, 604 F.3d at 117 (citation and emphasis omitted). The knowledge standard is objective, and includes persons who "know or have reason to know of the direct infringement." Id. at 118 (citation and emphasis omitted).

A secondary infringer makes a "material contribution" to the infringement when it provides substantial assistance to the direct infringer. Contributory liability derives from common law principles permitting a person who furthers a tortious act to be held jointly and severally liable with the prime tortfeasor. Id. at 117. Under common law tort principles, a person is liable for the conduct of another when, knowing that the tortfeasor's conduct constitutes a breach of duty, the person gives "substantial assistance" to the tortfeasor. See, e.g., Gen. Elec. Co. v. AAMCO Transmissions, Inc., 962 F.2d 281, 288 (2d

10

Cir. 1992); Restatement (Second) of Torts § 876(b); see also Perfect 10, Inc. v. Visa Inter. Service Ass'n., 494 F.3d 788, 796-97 (9th Cir. 2007).  In deciding whether contributory liability should attach, courts look to "the function that the alleged infringer plays in the total reproduction process." Artista, 604 F.3d at 118. (citation omitted).  Simply making something easier or more profitable is not sufficient when the aid provided lacks a direct connection to the infringing conduct. Perfect 10, 494 F.3d at 796.

S&S and Penguin have failed to allege a plausible claim of contributory infringement.  It is assumed for purposes of this analysis that S&S and Penguin have adequately alleged that at least some customers who purchased e-books from S&S and Penguin through Abbey House have infringed the publishers' copyrights by stripping DRM protection from those e-books, copying the e-books, and then distributing them to others.  But, S&S and Penguin have failed to allege that Abbey House knew of that illegal distribution or materially contributed to it.[2]

First, there is no plausible claim that Abbey House knew of

---

[2] Penguin's counterclaim is unambiguously concerned with the illegal distribution of its e-books after DRM protection is stripped.  S&S's counterclaim is more ambiguous regarding the direct act of infringement with which it is concerned.  But, S&S's counterclaim and brief repeatedly state that the danger of the removal of DRM protection is that e-books can easily be copied and re-distributed.  For example, the counterclaim explains that a single copy could "quickly be distributed to millions of readers" after DRM protection is stripped.  Thus, S&S's counterclaim is also construed to refer to copying for

any illegal distribution.  All that is alleged is that Abbey House knew its customers were removing DRM from their e-books.  As explained in the Announcement, with the demise of Abbey House, customers would no longer have access to its servicers to assist them in reading the e-books they had purchased on either their current device or on any new advice.  To continue to have access to their library of e-books purchased through Abbey House should problems arise or if they wished to transfer their e-books to another e-reader, consumers would have to strip DRM from their books.  Knowledge that consumers may do this is not knowledge that some consumers would go further and illegally distribute e-books to others.

 For similar reasons, S&S and Penguin have not plausibly alleged that Abbey House materially contributed to the improper distribution of e-books.  While it is alleged that Abbey House informed its customers of a third-party's product that would enable them to strip DRM from their e-books, such stripping is not itself an act of copyright infringement.  Nor is the stripping of DRM to transfer an e-book to a consumer's newly purchased e-reader the act of infringement at issue here.  With the demise of Abbey House, the stripping was as essential for their personal, noncommercial use as it was for a commercial misappropriation of the publishers' works.  Moreover, most of the cases in which courts have found a party to have provided

---

nonpersonal use and distribution to others.

material assistance to infringers are those in which the parties have themselves manufactured or provided a service or device that is employed in the act of infringement.[3]  The parties have not cited, and the Court has not found, any case finding contributory infringement where the product or service allegedly used to facilitate copyright infringement was owned and controlled by an unrelated third party.

Accordingly, the counterclaims based on contributory infringement are dismissed.  S&S and Penguin have not alleged facts sufficient to plead either knowledge of the copyright infringement alleged here or a material contribution to that infringement.

**B. Inducement of Infringement**

Inducement of copyright infringement requires "purposeful, culpable expression and conduct" that encourages copyright infringement.  Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 937 (2005).[4]  A claim of inducement -- more so than contributory infringement -- emphasizes the intent of the secondary infringer.  See Flava Works, 689 F.3d at 758-59; 3

---

[3] See, e.g., Sony Corp. of Am. v. Universal City Studios, Inc., 464 U.S. 417, 420 (1984); Artista Records, 604 F.3d at 113; Flava Works, Inc. v. Gunter, 689 F.3d 754, 756 (7th Cir. 2012); Perfect 10, 494 F.3d at 793; A & M Records v. Napster, 239 F.3d 1004, 1011 (9th Cir. 2001); see also 3 Nimmer on Copyright § 12.04(A)(3).

[4] Following the Supreme Court's decision in Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 914 (2005), inducement is analyzed as requiring different elements than

Nimmer on Copyright § 12.04(A)(4). "Evidence of active steps taken to encourage direct infringement, such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe . . . ." Grokster, 545 U.S. at 936 (citation omitted). Mere knowledge of the possibility that infringement may occur is insufficient to establish the intent required for inducement. Id. at 937. While most inducement cases have involved a product or device, inducement liability can extend to services. Columbia Pictures Indus., Inc. v. Fung, 710 F.3d 1020, 1033 (9th Cir. 2013) (operator of website cataloged and tracked "torrents" or pieces of files).

The facts alleged in the counterclaims are insufficient to plead the intent required for inducement of copyright infringement. While instructions may suffice in some circumstances to establish an intent to infringe, the instructions must relate to "an infringing use." Grokster, 545 U.S. at 936 (emphasis added). Here, Abbey House discussed only a noninfringing use in the Announcement: the removal of DRM protection by consumers so that they could continue to read their purchased e-books on new devices after Abbey House went out of business. This does not promote the infringement at issue here. Indeed, the terms of the Announcement, in which Abbey House told its users that removal of DRM-protection was permissible if done

---

contributory infringement.

for personal use, contradicts the general allegation that Abbey House had the specific intent to induce copyright infringement. That some users may have used the e-books in an infringing manner after removing DRM protection does not change this analysis; this was not the use for which Abbey House gave instructions or that it encouraged.

S&S and Penguin's arguments to the contrary conflate the removal of DRM protection with the infringement alleged in the counterclaims. There is no question that Abbey House encouraged the removal of DRM protection. The act of infringement underlying the inducement claim, however, is not the removal of DRM protection. Rather, it is the copying and distribution of e-books to others after such protection has been removed. The counterclaims do not allege that Abbey House encouraged such infringing acts.

The counterclaims for inducement of infringement are dismissed. Because both counterclaims based on copyright infringement are dismissed, Abbey House's argument that no actual infringement has been alleged need not be addressed.

## II. Breach of Contract

Abbey House has also moved to dismiss the counterclaims asserting that it breached its contractual commitment to distribute e-books only with DRM protection. Both contracts are

governed by New York law.[5]

"[T]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." In re Delta Air Lines, Inc., 608 F.3d 139, 146 (2d Cir. 2010) (citation omitted) (applying New York law). The best evidence of what parties to a written agreement intend is what they say in their writing. Id. An agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms. Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 467 (2d Cir. 2010) (citation omitted) (applying New York law). "The court should read the integrated contract as a whole to ensure that undue emphasis is not placed upon particular words and phrases, to safeguard against adopting an interpretation that would render any individual provision superfluous." Id. at 468 (citation omitted). "Further, the courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing." Id. (citation omitted).

**A. The S&S Contract**

Abbey House contends that S&S has failed to plead its breach of contract claim. The counterclaim asserts that the Announcement encouraged readers to strip the DRM protection from

---

[5] Both contracts state that the contracts are to be governed by the laws of the State of New York. No party has suggested that

e-books in violation of the S&S contract.  S&S has identified two contract provisions in support of its claim.  They are the duty imposed on Abbey House to ensure that "disclosures" to consumers are "consistent with the terms" of the contract, and to "promptly inform" S&S of misappropriation due to a breach in security measures.  S&S has adequately plead a claim for breach of contract under both provisions.

The S&S contract provides that "[a]ll content usage rules and other statements of the terms of sale or other disclosures provided to customers shall be consistent with the terms of this Agreement."  S&S has adequately pled a breach of this provision by alleging that the Announcement's instructions regarding the removal of DRM was inconsistent with the contract's requirement that e-books be sold with DRM protection.

The S&S Contract also provides that Abbey House "must promptly inform" S&S should Abbey House become aware the S&S's e-books have been "subject to Misappropriation due to a breach" of security measures, including DRM protection.  The contract defines misappropriation to include "theft, unauthorized copying or retransmission, printing, infringement, unauthorized manipulation, or any other misappropriation."  At the very least, the removal of DRM protection is an "unauthorized manipulation" since the S&S Contract required e-books to be sold with DRM protection.  S&S alleges that Abbey House did not promptly inform

---

any other state's law should apply.

S&S of any removal of DRM protection of which it became aware.

Abbey House argues that it has not breached the contract because it did not encourage customers to remove DRM protection for non-personal or commercial use. This does not alter the analysis. The contract requires DRM protection for all e-books, and the counterclaim pleads a violation of that requirement.

Nor does the fact that the DFP was responsible for maintaining DRM protection change this analysis. A single contract describes the obligations of S&S, Abbey House, and the DFP. The contract required Abbey House's disclosures to be consistent with its terms and required Abbey House to promptly advise S&S of any removal of DRM protection.

Accordingly, S&S has adequately pled a claim for breach of contract. Abbey House's motion to dismiss S&S's breach of contract counterclaim is denied.

**B. The Penguin Contract**

Abbey House also contends that Penguin has failed to plead a breach of contract claim. The counterclaim asserts that Abbey House breached the content use restrictions of the contract by posting the Announcement on its website.

While the Penguin Contract is structured similarly to the S&S Contract, it does not contain the disclosure or reporting requirements on which S&S relies in bringing its breach of contract claim. But, Penguin has identified one provision in its own contract to support its counterclaim. This provision

requires Abbey House to "condition purchase and use of eBooks on an End User's express agreement to the Content Usage Rules."  The Content Usage Rules, which limit the use of e-books to personal, noncommercial use, state that end users may: "Use eBooks on up to six (6) Transfer devices and an unlimited number of Non-Transfer Devices at the same time; or as allowed by the then current publisher approved DRMs . . . ."  A "transfer device" is a "computer that can transfer eBooks to any other device."  A non-transfer device is a "device . . . that cannot transfer a eBook to any other device . . . ."

The Penguin counterclaim does not allege that Abbey House failed to abide by this provision when it sold e-books to its customers.  The provision essentially required Abbey House to communicate to purchasers that a sale of a Penguin e-book was conditioned on an agreement to use the e-book on no more than six computers, with no limitation imposed on the number of e-readers.  Nothing in the Announcement breaches that requirement.

To the extent that the contract provision could be read to apply to Abbey House's interaction with its customers after the purchase of an e-book (and Penguin does not explain what ability Abbey House had post-sale to condition a customer's use of an e-book on any agreement), the counterclaim also does not plead a violation in that circumstance.  The Announcement was directed to e-books previously purchased through Abbey House and suggested a way in which the purchasers could continue to read those e-books

19

on newly purchased devices despite the presence of DRM protection.  Since the Content Usage Rules allow a customer to use an e-book on "an unlimited number" of e-readers, the counterclaim does not plausibly plead that the Announcement violated the obligation of Abbey House to condition use of e-books on the customer's agreement to abide by these terms.  Penguin's counterclaim for breach of contract is dismissed.

## CONCLUSION

Abbey House's September 9 motion to dismiss is granted in part.  The counterclaims by S&S and Penguin are dismissed with one exception: the motion to dismiss the S&S counterclaim for breach of contract is denied.

Dated:    New York, New York
          November 21, 2014

```
                                    _____
                                           DENISE COTE
                                    United States District Judge
```