```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
ABBEY HOUSE MEDIA, INC., d/b/a        :
BOOKSONBOARD,                         :
                                      :        14cv2000 (DLC)
                 Plaintiff,           :
                                      :        OPINION & ORDER
         -v-                          :
                                      :
APPLE INC.; HACHETTE BOOK GROUP, INC.;:
HARPERCOLLINS PUBLISHERS, LLC,;       :
VERLAGSGRUPPE GEORG VON HOLTZBRINCK   :
GHBH; HOLTZBRINCK PUBLISHERS, LLC,    :
d/b/a MACMILLAN; THE PENGUIN GROUP, A :
DIVISION OF PEARSON PLC; and SIMON &  :
SCHUSTER, INC.,                       :
                                      :
                 Defendants.          :
------------------------------------ X
```

APPEARANCES:

For Plaintiffs
Maxwell M. Blecher
Blecher Collins Pepperman & Joy P.C.
515 Figueroa St., Suite 1759
Los Angeles, CA 90071

For Defendant Hachette Book Group, Inc.
Michael Lacovara
Richard Snyder
Samuel J. Rubin
Freshfields Bruckhaus Deringer LLP
601 Lexington Avenue
New York, NY 10022

For Defendant HarperCollins Publishers, LLC
C. Scott Lent
Arnold & Porter, LLP
399 Park Avenue
New York, NY 10022

For Defendants Macmillan Publishers Inc., and Verlagsgruppe
Georg Von Holtzbrinck GmbH:
Joel M. Mitnick
John Lavelle

Sidley Austin LLP
787 Seventh Avenue
New York, NY 10019

For Defendant The Penguin Group:
Saul P. Morganstern
Amanda C. Croushore
Margaret A. Rogers
Kaye Scholer LLP
425 Park Ave.
New York, NY 10022

For Defendant Simon & Schuster, Inc.:
James W. Quinn
Yehudah L. Buchweitz
Jeff L. White
Weil, Gotshal & Manges LLP
767 Fifth Avenue, 25th Fl.
New York, NY 10153

DENISE COTE, District Judge:

    Abbey House Media, Inc. d/b/a BooksOnBoard ("BOB"), a

defunct e-book retailer, brings this action against five book

publishers, Hachette Book Group, Inc. ("Hachette"),

HarperCollins Publishers, LLC ("HarperCollins"), Macmillan

Publishers Inc. and Verlagsgruppe Georg Von Holtzbrinck GmbH

("Macmillan"), The Penguin Group ("Penguin"), and Simon &

Schuster, Inc. ("Simon & Schuster") (collectively, "Publisher

Defendants").  Pursuant to Section 1 of the Sherman Antitrust

Act, 15 U.S.C. § 1, and Section 340 of the Donnelly Act, N.Y.

Gen. Bus. Law § 340, BOB seeks to recover damages plaintiff

asserts it sustained due to the defendants' conspiracy with

Apple Inc. ("Apple") to fix prices and reduce competition in the

e-book industry.[1]

BOB's claims arise from discussions initiated by Apple in December 2009 with the Publisher Defendants to explore the terms under which e-books might be available for Apple's new device, the iPad, which Apple launched in January 2010.  As a result of these discussions, the Publisher Defendants implemented agency distribution agreements in 2010 with e-book retailers with the purpose and effect of eliminating retail price competition and raising the retail prices for many e-books.

In 2011 and 2012, the U.S. Department of Justice, various states, and class action plaintiffs filed antitrust lawsuits against the Publisher Defendants and Apple alleging violations of the Sherman Act.  While the Publisher Defendants settled these claims, Apple proceeded to trial and was found liable in July 2013.  United States v. Apple Inc., 952 F. Supp. 2d 638, 709 (S.D.N.Y. 2013).  In March of 2014, BOB filed this antitrust case alleging that its business was predicated on aggressive discounting and that the defendants' agency conspiracy thus caused BOB's demise.

Following the completion of discovery, the Publisher Defendants moved for summary judgment on the grounds that BOB has not shown that the alleged conspiracy caused the failure of

---

[1] The plaintiff also brought this lawsuit against Apple.  The plaintiff and Apple have settled.

its e-book business or that it suffered an antitrust injury.
The motion is granted.  The Publisher Defendants have provided
an extensive record demonstrating that BOB was failing as a
business before the Publisher Defendants implemented the agency
model for distributing their e-books in 2010, and that BOB could
not effectively compete through discounting or otherwise.
Rather than identifying agency pricing as the cause of its
demise, BOB instead touted agency pricing's benefits to both
investors and creditors.  BOB fails to rebut this evidence and
thus has not raised a disputed issue of material fact that would
entitle it to a trial.

## BACKGROUND

The following facts are undisputed or taken in the light
most favorable to the plaintiff.  Robert LiVolsi ("LiVolsi")
founded BOB in 2006 as an internet retail e-book store.  BOB's
e-books were principally read on desktop computers; BOB never
developed a dedicated proprietary e-reader.  According to
LiVolsi, as of 2006, it was still unclear whether "people would
accept e-books."  Amazon.com, Inc. ("Amazon") and Barnes &
Noble, Inc. ("Barnes & Noble") had recently closed their
inaugural e-book stores.

BOB did not purchase its e-books directly from the
Publisher Defendants.  Instead, it purchased e-books for its

inventory from wholesalers[2] at approximately 60% of the suggested digital list price ("DLP"), and generally discounted its prices for consumers between 17% and 21% off of DLP.  The "bread and butter" of BOB's business was the sale of e-book versions of paperback books.[3]  BOB also offered a rewards program to its customers.[4]

## I.  BOB's Competition

Beginning in 2007, BOB was faced with stiff competition. Amazon re-entered the e-book market at the end of 2007 and quickly became the dominant e-book retailer.  Amazon also introduced its popular e-reader device, the Kindle, in November 2007.  Amazon sold e-book versions of many hardcover books for $9.99, a price that was often well below BOB's inventory cost of the book.

In March 2009, Barnes & Noble re-entered the e-books market

---

[2] BOB purchased its inventory from two intermediary wholesale e-book distributors, OverDrive Inc. ("OverDrive") and Ingram DV LLC a/k/a Lightning Source Inc. ("Ingram").

[3] Most trade books appear first in hardcover.  Trade books consist of general interest fiction and non-fiction books, and are distinguished from "non-trade" books such as academic textbooks, reference materials, and other texts.  Apple Inc., 952 F. Supp. 2d at 648 n.4.  Publishers traditionally delayed the release of paperback versions of hardcover books with a practice known as windowing.  Id. at 652 n.10.

[4] For example, BOB's CEO has testified that customers could collect rewards to buy new e-books.  BOB has not offered evidence describing precisely how its rewards program worked or the extent to which it was employed.

as well, and by September of 2009, it had also adopted Amazon's $9.99 model for e-book versions of certain hardcover books. Barnes & Noble then introduced its e-reader device, the NOOK, in November 2009.  Barnes & Noble also discounted e-book versions of certain paperbacks, which had a direct impact on the core of the BOB business.  By 2009, Sony Corporation ("Sony") had entered the retail market and similarly discounted the e-books it sold.

The impact on BOB of the competition from Amazon, Barnes & Noble, and Sony was enormous.  BOB had negative net income every year it was in existence and never had a profitable quarter. While BOB's revenue grew somewhat, its monthly revenues were never large.  For example, they fluctuated between approximately $180,000 and $230,000 from April 2009 to March 2010.  As competition increased, BOB's rate of growth slipped.  Its year-over-year growth rate shrank from 150% in April 2009 to a meager 21% in March 2010.[5]

As BOB struggled, the e-book market took off and BOB lost market share.  BOB's share of the market decreased from about 3.7% in January 2008 to 0.5% in March 2010.  By March 2010,

---

[5] Year-over-year growth percentages, the plaintiff's preferred measurement, compare revenue from a given month to revenue from the corresponding month of the previous year.

Amazon, Barnes & Noble, and Sony had captured 98% of the e-book market.

Repeatedly, BOB failed to meet the targets LiVolsi set for his company.  For example, LiVolsi expected BOB to have a "strong profitable financial 90 day history to show lenders" by the end of May 2009, but as already recounted, it never made a profit.  Later in 2009, LiVolsi hoped to reach revenue goals of $270,000, $300,000, and $340,000 in October, November, and December, but failed to meet each of them.  Indeed, BOB significantly reduced its own revenue projections between 2008 and 2009 and still failed to meet its revised targets.

Reflecting its financial struggles, BOB owed money to its e-book suppliers.  In March 2009, LiVolsi offered one of its suppliers, Ingram, equity in exchange for forgiveness of debt.  Ingram rejected the invitation.  By September 2009, BOB was experiencing significant cash flow problems.  LiVolsi attributed these to Ingram's demand that BOB pay its indebtedness, which Ingram had determined had grown "too deep," to a loss of $10,000 in sales due to a BOB website glitch,[6] and BOB's expenditures for television promotions.[7]

---

[6] BOB temporarily could not process PayPal and credit card sales due to a technical glitch with PayPal.

[7] These BOB promotions were to air on the Tyra Banks Show and the Emmy Awards Show.  The Tyra Banks Show promotion never aired.

Responding to BOB's financial difficulties, LiVolsi undertook cost-cutting measures that further undermined BOB's prospects for growth.  In March 2009, BOB reduced the funds devoted to driving customers to its website.  In late 2009, BOB delayed paying its public relations firm and implemented employee lay-offs and pay cuts.  BOB's laid off four of its employees and the salaries of remaining employees were cut by as much as 50%.

There is a robust contemporaneous record of LiVolsi's recognition of BOB's severe financial troubles.  He wrote to a BOB vice president that margins were "catastrophic" with over $60,000 in losses in December 2008 and January 2009.  By March 2009, he observed that BOB had $390,000 "in payables outstanding."  Indeed, that month, BOB implemented an across the board 6% price hike to improve margins.

LiVolsi repeatedly attributed BOB's difficulties to its inability to compete with larger e-book retailers that were offering deeper discounts and that had their own proprietary devices for reading e-books.  As early as November 2007, he observed that "[i]t will be hard for our business to get behind Amazon's pricing and the Kindle in their current state."  Two years later, in an April 2009 email LiVolsi explained that BOB could not make royalty payments because "[c]ompeting with Amazon Kindle's below cost pricing and proprietary format . . . has

significantly damaged our business and profitability."  In

August 2009, LiVolsi reported to one of its suppliers,

OverDrive, that

> Margins continues to haunt us as the 9.95 thing is
> starting to cut into us.  We have a hard focus on
> improving margins with new pricing tools and twice
> weekly reviews; challenge is competing with 40%
> discount as a starting point against those with deeper
> pockets and 50% as a starting point.

Similarly, in October 2009, he explained to his advertising

agency that

> Amazon's predatory pricing, well below cost on titles
> like this, is very costly to our profit margins and,
> as demonstrated here, restricts choice to consumers. .
> . .  Now Barnes & Noble and Sony have followed suit
> pricing new hardcover-equivalent ebooks at 9.95, well
> below costs.  We have to match to maintain complete
> offerings for our customers.  Each copy of Lost Symbol[8]
> sold cost us about $7 straight out of the bottom line.

Later that month, LiVolsi acknowledged defeat.  As he wrote to

one of his employees: "the space has now accelerated to where we

cannot keep up with Amazon, Barnes&Noble or Indigo/Chapter

(Shortcovers)."

## II. BOB's Other Competitive Disadvantages

As LiVolvsi's above-quoted comments reflect, in addition to

BOB's inability to compete on price, BOB was hobbled by its lack

of a proprietary e-reader device.  In late 2009, LiVolsi

acknowledged that the development of a device could have

---

[8] Lost Symbol refers to a best-selling novel by author Dan Brown.

provided a "temporary bridge" to support the BOB business as it struggled to compete against its largest competitors, but that it would have required a "major capital infusion" that was beyond BOB's reach.  Through 2012, most BOB customers downloaded e-books and read them on desktop computers.  As of late 2012, LiVolsi calculated that one-third of BOB's customers had migrated to Kindles and NOOKS over the previous 18 months and would no longer purchase e-books from BOB.  LiVolsi had acknowledged for years that the lack of a device was a major disadvantage in BOB's business model and that BOB needed to, in his words, "marry with a carrier on a big device," but that never happened.[9]

BOB faced several other competitive disadvantages as well. First, unlike Amazon and Barnes & Noble, BOB did not have any direct relationships with major publishers, including with any of the Publisher Defendants.  Instead, BOB purchased its inventory from intermediary wholesalers.  Because of the additional fees that BOB had to pay to wholesalers, BOB had higher inventory costs than competitors like Amazon and Barnes & Noble, who purchased their e-books directly from publishers.

---

[9] While BOB e-books were available to be read on some devices, they could not be read on closed-environment e-readers such as the "low end" Kindle Fire and NOOK tablets.  Indeed, BOB does not dispute that the existence of proprietary e-reader devices added to BOB's difficulties both before and after the Publisher Defendants' implementation of agency distribution.

BOB also had problems with its website.  One persistent technical problem displayed "new releases" with "white covers," which discouraged purchasing.  In October 2009, a BOB developer created a "duplicate website" that reduced traffic to BOB's real website.[10]

By late 2009, LiVolsi understood that BOB could not survive without a significant cash infusion.  LiVolsi contacted a venture capital firm seeking a "partnership or a strategic acquirer that can leverage [BOB's] resources and help us compete . . . ."  LiVolsi acknowledged that he could not "sustain world class competition with just our resources here against the likes of Amazon, Barnes & Noble and Waterstones."[11]  In LiVolsi's view, the "big guys" were "simply crowding us out with their sheer mass."

## III. The Conspiracy Period

The conspiracy claims that underlie this lawsuit arise from the discussions which Apple initiated in December of 2009 with the Publisher Defendants to explore the terms under which the publishers' e-books might be available for Apple's new device, the iPad, which Apple launched on January 27, 2010.  The iPad had the ability to function as an e-reader and to offer the

---

[10] BOB dismissed the developer.

[11] "Waterstones" is a large British book retailer.

iBookstore.  Each of the Publisher Defendants agreed to sign an
agency distribution agreement with Apple and supply it with
their e-books.  Because of the terms of their agreements with
Apple, each of the Publisher Defendants then required other e-
book retailers to execute similar agency agreements.

Under the agency model, a publisher is the seller of record
and sets the retail price for an e-book.  Retailers sell the e-
book as the publisher's agent, earning a commission on the sale
price.  The Publisher Defendants had previously sold e-books
through the wholesale model, whereby the publisher sold an e-
book for a wholesale price and the retailer set the retail
price.  With the arrival of the agency model, Amazon, Barnes &
Noble, BOB, and every other e-retailer lost the ability to
discount those e-books for which the Publisher Defendants sought
to control the retail price.  For the most part, the Publisher
Defendants' agency contracts controlled the e-book retail prices
for those physical books that were only available as hardcover
books and not for physical books that had also been released as
paperback books.  For example, the agency agreement between
Hachette and Apple only applied agency pricing to e-book
equivalents of frontlist hardcover books.  The agency model went
into effect for most of the Publishers Defendants as of April 3,
2010.  The purpose and effect of this conspiracy was to
eliminate retail price competition for many e-books and to raise

the retail prices for those e-books.  As a result of the agency model, e-book retailers purchasing directly from the Publisher Defendants were guaranteed a commission on the e-books they sold.  The Publisher Defendants' agency agreements set this commission at 30%.[12]

In his communications to investors and creditors, LiVolsi explained that the arrival of the agency model was an advantage for BOB.  LiVolsi told one of BOB's creditors, "[t]he pricing structure is ultimately a good thing for us and will improve our profitability."[13]  On June 16, 2010, LiVolsi advised a potential investor that the agency model "is actually a good thing for us once past the integration of it as it stabilizes our gross margin and makes it more predictable."  This was true because BOB's "biggest margin impact was from sub-cost pricing from Amazon and Barnes & Noble.  Under [the agency] model, pricing is fixed across the board."  Indeed, the following year, he even

---

[12] With the adoption of the agency model and the substantial commission payments, the Publisher Defendants actually reduced their revenue from sales of many e-books.  They anticipated, however, that by raising the retail prices of e-books, they would protect their sales of hardcover books, from which they had traditionally profited.

[13] In this same email, LiVolsi acknowledged, however, that the adoption of the agency structure had thrown BOB a "curve ball" since it had been deprived of access to books during the transition period.  That difficulty is described below.

contemplated suggesting to a small publisher that it use agency pricing to sell its books to BOB and all other retailers.

Although LiVolsi expressed enthusiasm about the Publishers Defendants' adoption of the agency model, BOB encountered serious difficulties during the transition period.  Because BOB did not purchase books directly from the Publisher Defendants, BOB depended on its e-book suppliers promptly executing agency agreements with the Publisher Defendants and making e-books available to BOB under those new terms.  That did not happen immediately.  Precisely how long BOB was deprived of access to e-books is hotly contested.  It appears that it took several months for agreements to be executed with the principal Publisher Defendants on which BOB relied for most of its titles.[14]  BOB eventually signed tripartite agreements with distributors OverDrive and Ingram and four of the Publisher Defendants: HarperCollins on May 7, Penguin on May 19, Simon & Schuster on August 24, and Hachette on September 20, 2010.[15]

---

[14] BOB contends that it took even longer to regain access to all publishers' books, but has not provided documents to pinpoint the length of time it took to obtain access to other publishers' titles, or to correlate that information with the proportion of its business that depended on sales of these other publishers' books.

[15] The parties did not provide copies of each of these documents as part of the record on this motion, but these dates appear to be undisputed.

Emails submitted by the parties indicate, however, that
HarperCollins's titles were again available on April 12, less
than two weeks after the implementation of agency, and Simon &
Schuster's became available on May 24.[16]  BOB thus had access to
product from three of the Publisher Defendants, HarperCollins,
Penguin, and Simon & Schuster, within a month and a half of
agency implementation.

    LiVolsi repeatedly emphasized during 2010 that this
interruption in access to inventory was very damaging to BOB,
even though the switch to the agency model was an advantage.
For instance, on April 30, 2010, LiVolsi wrote to Ingram about
its efforts to secure agency agreements with the Publishing
Defendants, noting that "the outage -- not the agency pricing --
has thrown us under the bus for the moment."  Repeating this
theme, in February 2011, LiVolsi proposed the following revision
to a Wikipedia entry on the e-book industry:

> By the end of 2010, without product that often
> represented more than half of revenue, many
> pioneering eBook retailers close [sic] their doors,
> squeezed out not by the agency scheme itself, but by
> the failure of the publishers to work with the
> smaller long-term retailers in the wholesale channel
> on a timely basis.

(emphasis added).  In November 2012, well after the Department

---

[16] May 24, 2010 is also the day that OverDrive signed its
independent agency agreement with Simon & Schuster.

of Justice and various States filed antitrust lawsuits against

the defendants, LiVolsi prepared a draft letter to an associate

general counsel at HarperCollins noting that he had "been

approached by numerous contingency litigators in the wake of the

DOJ activity" and that he had "a fiduciary obligation to explore

[BOB's] options."  He further noted that the damages experienced

by BOB "were not in the price fixing, but in the sudden lack of

availability of product through the wholesale channel."[17]

---

[17] BOB objects to the use of this letter on the grounds that it
is protected by work-product doctrine and attorney client
privilege.  In the Second Circuit, waiver of privilege depends
on balancing a number of factors, including the reasonable of
precautions taken to prevent inadvertent disclosure and the time
taken to rectify an error.  See In re Grand Jury Proceedings,
219 F.3d 175, 188 (2d Cir. 2000); Lois Sportswear, U.S.A., Inc.
v. Levi Strauss & Co., 104 F.R.D. 103, 105 (S.D.N.Y. 1985)
(setting out four factors that courts balance to determine
waiver).  Here, plaintiff handed over this letter to the
defendants as part of the discovery process.  The letter was
then introduced as Exhibit 7 at LiVolsi's February 2015
deposition.  During the deposition, LiVolsi initially answered
several questions about the document, then stated that he had
co-written the letter with a lawyer, that it was never finalized
or sent, and that the letter "should be privileged by the way."
Plaintiff's counsel concurred stating that he "didn't know that
this was co-written with an attorney," that he was "going to
look into this some more . . . we have a claw-back agreement,"
and that he "reserved my rights for it."  Defense counsel
responded that it was clear from metadata that LiVolsi was the
author, and then agreed to discuss the letter later with
opposing counsel.  BOB does not appear to have followed up with
defense counsel since the February 2015 deposition, nor did it
seek to limit questioning of the document during the deposition.
Indeed, BOB has introduced the LiVolsi testimony about this
letter into the record and has provided no further evidence that
the document was co-written by a lawyer.  As such, BOB has
waived any privilege that might have been available to it.

Toward the end of 2010, LiVolsi reflected on BOB's strategic failures.  He identified five items that "threw off" BOB from its business plan.  The fifth and last item on his list was the loss of access to e-books during the conversion to the agency system.  He estimated that that "outage" cost BOB 70% of its regular customer base.  LiVolsi concluded that if BOB had developed a direct relationship with Hachette and at least one other publisher in 2009, that BOB "would have avoided" this disruption.

Notably, the first four items on LiVolsi's list were events that predated the Publisher Defendants' adoption of the agency model.  They were BOB's failure to develop its own e-reader, its failed promotional investments in September 2009, the duplicate BOB website created by an employee in October 2009, and Ingram's repayment demands in September 2009.

The absence of any reference in LiVolsi's list to the Publisher Defendants' adoption of the agency model is not unusual.  No contemporaneous document reflects that LiVolsi attributed BOB's struggles to the decision by the Publisher Defendants to alter their distribution model in this way and eliminate retail price competition.  Quite the contrary, where retail price competition remained, for example in the sales of e-book versions of romance novels and paperbacks, which were not subject to agency pricing, LiVolsi readily admitted that BOB

remained uncompetitive.  In a May 2011 email to OverDrive, LiVolsi wrote that "it's become pretty obvious that no matter how good a basic business you build or how efficiently you manage it, deeper pockets than mine are essential when competing in a world where the competitors are willing to lose big money indefinitely."

Moreover, even after BOB and its wholesale suppliers had executed agency agreements with the Publisher Defendants, BOB continued to experience inventory problems.  Many of the important new titles were not available to BOB at all or were not available until several days past the release date.  This put BOB at a competitive disadvantage with e-book retailers who had direct purchasing arrangements with publishers and no need to rely on wholesalers.

In LiVolsi's view, BOB was "effectively" finished in late 2011 and was "fundamentally done by 2012."  The final blow to its business occurred in the Fall of 2012, when BOB lost all credit card processing privileges during an investigation into potential hacking.  BOB estimated that it lost several hundred thousand dollars due to this problem alone.  As of 2013, BOB admitted that the "product outage" and the suspension of the credit card payments had destroyed its reserves.  BOB stopped selling e-books on April 6, 2013.

**IV. BOB Brings Lawsuit against Publisher Defendants**

As BOB's internal documents reflect, it did not blame its demise on the defendants' adoption of agency agreements and the elimination of retail price competition for many e-book titles. Accordingly, it did not initially join the wave of antitrust litigation filed against Apple and the Publisher Defendants.

Beginning on August 9, 2011, class action complaints were filed against the defendants alleging violations of the Sherman Act, culminating in a consolidated amended class action complaint being filed on January 20, 2012.  In re Elec. Books Antitrust Litig., 859 F. Supp. 2d 671, 680 (S.D.N.Y. 2012).  On April 11, 2012, the Department of Justice and various States filed antitrust lawsuits against the Defendants.  The Publisher Defendants eventually settled these actions.  Apple, however, proceeded to trial and was found liable in July 2013.  Apple Inc., 952 F. Supp. 2d at 709.

It was not until Apple was found liable in 2013 that e-book retailers filed individual lawsuits against Apple and the Publisher Defendants.  Three such lawsuits were filed in 2013 and 2014, each alleging that the retailer was directly harmed by the e-book price-fixing conspiracy.  DNAML Pty, Ltd. filed its complaint on September 16, 2013; Lahovo, LLC filed its complaint on March 14, 2014; and BOB filed its complaint on March 21, 2014.

BOB asserts two claims: (1) for violation of Section 1 of the Sherman Act, 15 U.S.C. § 1; and (2) for violation of the Donnelly Act, N.Y. Gen. Bus. Law § 340.  BOB alleges that its business model was predicated on "aggressively pricing a wide selection of e-books" and "offer[ing] a rewards program meant to develop customer loyalty and encourage repeat business."  BOB further alleges that the implementation of the defendants' agency model destroyed retail price competition and "forced BooksOnBoard in line with everyone else by eliminating competitive advantages" of "offering attractive prices, a desirable rewards program, [and] attractive cross platform support."  BOB thus alleged that "[w]ithout an ability to compete based on price -- upon which it predicated its business model -- BooksOnBoard never recovered."  After it reached a settlement with BOB, Apple was dismissed from the case on April 21, 2015.

On September 18, 2015, the Publisher Defendants filed a joint motion for summary judgment.  They argue that BOB cannot show antitrust injury and that BOB's failure was not caused by the alleged conspiracy.  The motion was fully submitted on October 31.

## DISCUSSION

Summary judgment may not be granted unless all of the submissions taken together "show[ ] that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Smith v. Cty. of Suffolk, 776 F.3d 114, 121 (2d Cir. 2015) (citation omitted). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts in the light most favorable to the non-moving party. Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992); Gemmink v. Jay Peak Inc., 807 F.3d. 46, 48 (2d Cir. 2015).

Once the moving party has asserted facts showing that the non-movant's claims or affirmative defenses cannot be sustained, "the party opposing summary judgment may not merely rest on the allegations or denials of his pleading; rather his response, by affidavits or otherwise as provided in the Rule, must set forth specific facts demonstrating that there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (citation omitted); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment," Ridinger v. Dow Jones & Co. Inc., 651 F.3d 309, 317 (2d Cir. 2011) (citation omitted), as is "mere speculation or conjecture as to the true nature of the facts." Hicks v. Baines,

593 F.3d 159, 166 (2d Cir. 2010) (citation omitted).  Only
disputes over material facts -- "facts that might affect the
outcome of the suit under the governing law" -- will properly
preclude the entry of summary judgment.  Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 248 (1986).

To succeed on its claims, BOB must show that it suffered an
antitrust injury.  Gatt Commc'ns, Inc. v. PMC Associates,
L.L.C., 711 F.3d 68, 81 (2d Cir. 2013).  Proving that a
plaintiff has suffered an antitrust injury requires, among other
things, proof that it suffered "the type of injury contemplated
by" the antitrust laws.  Cash & Henderson Drugs, Inc. v. Johnson
& Johnson, 799 F.3d 202, 214 (2d Cir. 2015) (citation omitted).
In particular, the plaintiff must demonstrate that its injury is
"of the type the antitrust laws were intended to prevent and
that flows from that which makes defendants' acts unlawful."
Atl. Richfield Co. v. USA Petroleum Co. ("ARCO"), 495 U.S. 328,
334 (1990) (citation omitted); see Gatt Commc'ns, Inc., 711 F.3d
at 76.  In other words, the plaintiff must show that any
business loss it suffers "stems from a competition-reducing
aspect or effect of the plaintiff's behavior."  ARCO, 495 U.S.
at 344.  Accordingly, a plaintiff cannot establish antitrust
injury where it "actually tended to benefit" from the alleged
conduct.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986).

BOB must also establish a causal link between the violation of the law and its claimed injury, specifically that "the injuries alleged would not have occurred but for" the defendants' antitrust violation.  In re Publ'n Paper Antitrust Litig., 690 F.3d 51, 66 (2d Cir. 2012) (citation omitted); see also Argus Inc. v. Eastman Kodak Co., 801 F.2d 38, 41 (2d Cir. 1986).  A lack of causation in fact "is fatal to the merits of any antitrust claim."  Lotes Co. v. Hon Hai Precision Indus. Co., 753 F.3d 395, 415 n.8 (2d Cir. 2014) (citation omitted). To show causation, "[i]t is enough that the illegality is shown to be a material cause of the [antitrust] injury; a plaintiff need not exhaust all possible alternative sources of injury in fulfilling [its] burden of proving compensable injury" since an antitrust defendant's unlawful conduct "need not be the sole cause of the plaintiffs' alleged injuries."  In re Publ'n Paper Antitrust Litig., 690 F.3d at 66 (citation omitted).  Rather, "to prove a causal connection between the defendant's unlawful conduct and the plaintiff's injury, the plaintiff need only demonstrate that the defendant's conduct was a substantial or materially contributing factor" in producing that injury."  Id. (citation omitted).

New York's antitrust statute, the Donnelly Act, is "construed in light of Federal precedent and given a different

interpretation only where State policy, differences in the
statutory language or the legislative history justify such a
result." Gatt Commc'ns, Inc., 711 F.3d at 81 (citation
omitted).  The parties agree that their arguments apply equally
to BOB's claims under the Donnelly Act as to its claims under
the Sherman Act.

BOB contends that the Publisher Defendants conspired with
each other and with Apple to eliminate price competition within
the retail market for e-books and to raise the price of e-books.
It argues that that conspiracy destroyed BOB's business because
BOB could no longer offer e-books at discounted prices.  But,
BOB has not offered sufficient evidence to support this theory
of injury and causation, or raise a question of fact in this
regard.  As such it cannot establish antitrust injury or
causation in fact.

Drawing liberally from BOB's own documents, which include
its contemporaneous understanding of its industry and the
pressures which caused it to fail, the defendants have presented
overwhelming evidence that their elimination of retail price
competition did not cause the demise of BOB's business, and that
at the time BOB did not think it did.  As BOB acknowledged in
2010 and 2011, the end of retail price competition for a portion
of its business actually assisted BOB.  When selling titles as
an agent, it was no longer hamstrung by its inability to compete

on price with deeper-pocketed competitors, such as Amazon and
Barney & Noble.  Where retail price competition remained
available, which was the case for BOB's "bread and butter" line
of e-book equivalents to paperbacks, BOB continued to be plagued
by price competition with its far larger and better-funded
competitors.

While it is unnecessary to determine precisely what factors
caused BOB to fail, several explanations emerge from the
evidentiary record.  Among the most prominent are BOB's failure
to develop or become associated with any e-reading device; a
supply chain dependent on wholesalers rather than direct
relationships with publishers; and its relatively meager
financial resources.  Added to these pressures were the vagaries
that afflict many a start-up.  For instance, money it could ill
afford to spend was devoted to advertising and promotion
projects that failed to materialize or yield benefits, and an
employee created a duplicate website, which diverted customers.
As 2009 progressed, its wholesale suppliers became increasingly
reluctant to extend credit to BOB.  All of these difficulties
existed well before the Publisher Defendants adopted the agency
model in 2010.  Repeatedly, in advance of April 2010, BOB failed
to meet internal targets, struggled to maintain its cash
reserves, and underwent significant cost-cutting measures that
never succeeded in making the business profitable for even a

single quarter.[18]  Indeed, by the end of 2009, LiVolsi was hoping
to sell BOB.

In opposition to this motion for summary judgment, BOB has
relied principally on five sources of proof in support of its
contention that the Publisher Defendants' adoption of the agency
model for the distribution of e-books destroyed BOB's business.
None of this evidence succeeds, whether taken singly or
together, in raising a question of fact regarding causation.

First, BOB argues that discounting was essential to BOB's
business strategy and the inability to discount the prices of
certain e-books during the agency period deprived it of a
critical tool in its competitive arsenal.  The extent to which
BOB's business was predicated upon discounting and the
effectiveness of its discounting program are hotly disputed by
the parties.[19]  But, what cannot be disputed on this record is

---

[18] While BOB does not need to demonstrate that it would have been
profitable absent the defendants' antitrust conspiracy, its lack
of profitability at any point during its existence along with
the numerous other financial challenges presented in the record
provide compelling evidence that BOB's overall business model
was failing during a period in which there was robust retail
price competition.

[19] The defendants have offered evidence that, even with
discounting, the prices of BOB's e-book versions of newly
released hardcover books were substantially higher than those of
its main competitors, Amazon and Barnes & Noble.  BOB's expert
disputes the defendants' methodology and counters that, because
BOB could use price promotions as a marketing tool, BOB could
benefit from discounting even if it did not offer the lowest
prices in the marketplace.

that BOB could not compete effectively on price with the major
retailers who employed discounting, such as Amazon and Barnes &
Noble, particularly when both of those competitors also sold a
device for reading e-books to which BOB did not have access.[20]
Indeed, even after the agency distribution program went into
effect in April 2010 for certain e-books, BOB was unable to
compete on price with Amazon and other e-book retailers with
respect to the e-books for which discounting remained an option.
And, according to LiVolsi, the books that fell into this latter
category were its "bread and butter".

Second, BOB argues that it has demonstrated causation
through proof that its supply of inventory was disrupted at the
time the agency distribution system went into effect, which it
calls the "product outage."  To succeed on this claim,
plaintiff's asserted injury from the product outage must be
"inextricably intertwined with the conduct's anti-competitive
effects and thus flow[] from that which makes defendants' acts
unlawful."  In re DDAVP Direct Purchaser Antitrust Litig., 585
F.3d 677, 688 (2d Cir. 2009) (citation omitted) (addressing

---

[20] While the plaintiff has offered an expert report in opposition
to this motion, its expert has not presented any analysis to
support a conclusion that the plaintiff was materially harmed by
agency pricing or that BOB could have succeed in a market that
did not have agency pricing.  The expert merely notes that he
had "considered various alternative causes" for BOB's failure
"to the degree needed . . . to render reliably" his opinion.

antitrust standing).

BOB has offered evidence that the product outage severely damaged its business and argues that the outage was a foreseeable consequence of the Publisher Defendants' rapid implementation of the agency model.  The temporary interruption in the supply chain that accompanied the agency transition, however, occurred independently of the "anti-competitive effects" of that illegality.  The illegality alleged here is the conspiracy to eliminate retail price competition for certain e-books.  This lawsuit is not premised on a theory that the Publisher Defendants conspired to eliminate e-book wholesalers or harm independent retailers dependent on wholesalers.

Even if each of the Publisher Defendants responsible for supplying BOB with e-books had independently decided to switch to an agency model (as opposed to illegally conspiring to do so), BOB would have experienced disruption to its inventory because of its dependence on wholesalers.[21]  LiVolsi himself acknowledged as much in proposed revisions to a Wikipedia entry on the e-book industry, writing that "many pioneering eBook

---

[21] DNAML, the plaintiff in a related antitrust case brought against the same defendants, did not rely on wholesalers and had a direct relationship with Hachette.  At the time Hachette adopted the agency model, DNAML experienced no product outage. DNAML Pty, Ltd. v. Apple, 13-cv-6516, 2015 WL 9077075 (S.D.N.Y. Dec. 16, 2015).

retailers close [sic] their doors, squeezed out not by the
agency scheme itself, but by the failure of the publishers to
work with the smaller long-term retailers in the wholesale
channel on a timely basis."  The product outage was merely
incidental to the implementation of agency pricing and thus did
not "flow[] from that which makes the defendants' acts
unlawful."  Gatt Commc'ns, Inc., 711 F.3d at 76 (citation
omitted) (antitrust standing).

        Third, BOB argues that the steep decline in its revenue
immediately after the implementation of agency pricing
demonstrates that its injury "flowed from" the antitrust
conspiracy.  But, this correlation in time is insufficient to
show causation.  The dramatic impact of the product outage on
BOB's revenue eviscerates this claimed causal link.  Depending
on the timing of the revenue drop to prove that the conspiracy
caused its injury is a classic post hoc ergo propter hoc logical
fallacy.[22]  Cf. Rothstein v. UBS AG, 708 F.3d 82, 96 (2d Cir.
2013); Lightfoot v. Union Carbide Corp., 110 F.3d 898, 906 (2d
Cir. 1997).

        Fourth, BOB asserts that there is evidence from its revenue

---

[22] Post hoc ergo propter hoc, translated as "after therefore
resulting from it," refers to "the logical fallacy of assuming
that a causal relationship exists when acts or events are merely
sequential."  Black's Law Dictionary (10th ed. 2014).

growth that it had a successful business before the conspiracy
went into effect in April 2010.  Acknowledging that it never
made a profit, BOB claims that its business model was predicated
instead on increasing its revenues and that those revenues grew
from 2008 until April 2010.  There are two principal flaws in
this argument.  First, BOB's alleged focus on revenues, not
margins, is belied by LiVolsi's frequently expressed concern in
2009 over BOB's inability to show a profit.  For example, in
August of 2009, LiVolsi assured one of its wholesale suppliers
that BOB had a "hard focus on improving margins," but admitted
that it was a "challenge" to compete with "40% discount as a
starting point against those with deeper pockets."

But, even assuming that a destruction of revenue growth in
the Spring of 2010 would be sufficient to raise a question of
fact regarding whether the conspiracy led to the demise of BOB,[23]
BOB's revenue figures do not gibe with its argument.  In the six
months before the agency pricing model went into effect, BOB's
revenue growth (as measured from one quarter to the next) was
essentially flat.[24]  While BOB prefers to highlight its year-

---

[23] Apparently, because the product outage had such a substantial
impact on BOB's revenue, BOB has not tried to show that any
particular portion of the decline in revenue following March
2010 was separately attributable to the conspiracy.

[24] Using the revenue numbers presented in BOB's brief in
opposition to this motion, from the second to the third quarter
of 2009, BOB's revenues increased by approximately 3%; from the

over-year growth, even those figures were rapidly shrinking in the run up to agency.[25]

Finally, BOB relies on LiVolsi's own opinions regarding the impact of the agency model on his business to establish causation. One of these opinions was expressed in an email from 2010, the other opinions are expressed in his 2015 deposition testimony and in his 2015 affidavit submitted in opposition to this motion. Assuming these opinions are admissible evidence of causation,[26] they do not create a question of fact regarding causation that requires a trial. The three opinions are as

_____

third to the fourth quarter of 2009, BOB's revenues increased by 0.2%; and, from the fourth quarter of 2009 to the first quarter of 2010, BOB's revenues increased by 0.7%.

[25] BOB's year-over-year progressively shrunk from 150% in April 2009 to a mere 21% by March 2010.

[26] It is assumed that LiVolsi's testimony about this aspect of the business he founded and ran would be admissible as expert opinion testimony under Fed. R. Evid. 702. In 2001, Rule 701 was amended to provide that testimony cannot be received as lay opinion testimony if it is "based on scientific, technical, or other specialized knowledge within the scope of Rule 702." See Fed. R. Evid. 701(c). Rather, a "lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Haynes, 729 F.3d 178, 195 (2d Cir. 2013) (citation omitted). This rule "prevent[s] a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702." Id. (citation omitted). In contrast, the many statements by LiVolsi in emails and correspondence offered by the defendants describing BOB's financial troubles and the benefits of agency are admissible as admissions by a party-opponent. See Fed. R. Evid. 801(d)(2).

follows.

In an email to an investor on March 24, 2010, LiVolsi recommended accepting OverDrive's offer to acquire BOB, observing that "Overdrive has moved a little.  Agency pricing is scaring the heck out of me so I think it might be wise to go forward with this deal where it is."  LiVolsi does not elaborate in this email on what about agency pricing scared him. Acknowledging, however, that BOB had yet to make a profit and had no immediate prospect of doing so, LiVolsi added that OverDrive's offer was "not a big return, but something bigger than no return."  The email proceeds to highlight four other reasons to take the OverDrive offer, including that Barnes & Noble had "over 200 developers working on their site" and that "most concerning, entry of B&N and the much more crowded field has resulted in far fewer natural search visits [to BOB's website]."

BOB also relies on parts of LiVolsi's 2015 deposition testimony attesting that, despite his many statements in 2010 and 2011 documents to the contrary, he was indeed worried in 2010 about the impact of the agency system on BOB.  Similarly, BOB relies on LiVolsi's revelation in his 2015 affidavit in opposition to this motion that, after getting formal notification on March 12, 2010 of the specifics of the agency program from one of his wholesalers, he contacted two government

agencies between March and June 2010 to express his concern over agency pricing, specifically, that the "agency scheme was depriving customers of discounts and choice" and would result in higher prices for e-books.[27]  LiVolsi asserts that he also expressed concern that BOB would be unable to retain its customers and that many e-book retailers would be driven out of business.  LiVolsi does not provide any notes or correspondence from these meetings to confirm precisely what opinions or observations he conveyed to these government officials in 2010.

As already described, these opinions stand in sharp contrast to the documentary record from 2009 to 2011.  BOB could not and did not compete successfully in the pre-agency period against larger companies that offered deeper discounts than BOB was prepared or able to offer.  Accordingly, BOB's documents reflect LiVolsi's view that the elimination of price competition through the adoption of the agency distribution model would actually assist BOB.[28]  LiVolsi expressed this view internally

---

[27] LiVolsi attests that he spoke with an Assistant United States Attorney in the United States Department of Justice Antitrust Division and met with representatives of the Texas Attorney General's Office.  Lead Counsel in the parens patriae antitrust action filed in 2012 against Apple and the Publisher Defendants included counsel from the State of Texas' Attorney General's Office.

[28] Many of Livosli's statements were made to investors to whom he would have owed a duty of honesty.  See, e.g., Chris-Craft Indus., Inc. v. Piper Aircraft Corp., 480 F.2d 341, 364 (2d Cir. 1973) ("Corporate officers and directors in their relations with

and in communications with others.  Thus, while LiVolsi was very concerned with the product outage issue and its impact on small e-book retailers, the documentary record does not reflect a belief that the switch to an agency distribution model per se would harm BOB or had harmed BOB.  After the dust had settled, and the agency model had been fully implemented by the Publisher Defendants, LiVolsi's drafted Wikipedia entry of 2011 denied that agency pricing presented a problem.  He complained only of the impact the product outage had had on small e-book retailers.

In the face of the many contemporaneous statements by LiVolsi that contradict the opinions on which BOB relies in opposing this motion, these opinions do not create a genuine dispute as to LiVolsi's mindset in 2010, much less a genuine dispute as to whether the elimination of retail price competition actually inflicted harm on BOB in 2010.  See, e.g., AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A., 626 F.3d 699, 735-36 (2d Cir. 2010) (evidence created after summary judgment was filed could not raise an issue of fact where it was contradicted by documents created at the same time as the transaction at issue).  Such testimony, "unsupported by documentary or other concrete evidence . . . , is simply not

shareholders owe a high fiduciary duty of honesty and fair dealing.").

34

enough to create a genuine issue of fact in light of the evidence to the contrary." Argus Inc., 801 F.2d at 45.

In sum, BOB was engaged in an uphill battle to succeed as an e-book retailer in the face of competition from Amazon, Barnes & Noble and others.  It viewed the adoption of the agency model as something that would assist it, and there is every reason to accept its judgment on that score as accurate. Ultimately, BOB failed as a business.  While BOB closed its doors after the Publisher Defendants conspired to eliminate retail price competition in a significant portion of the e-book market, BOB has not presented sufficient evidence to permit a jury to find that the failure of its business was due to that conspiracy.

**CONCLUSION**

The Publisher Defendants' September 18 motion for summary judgment is granted and the claims asserted in this action are dismissed with prejudice.  The Clerk of Court shall close the case.

SO ORDERED:

Dated:   New York, New York
         January 22, 2016


                        _____
                             DENISE COTE
                     United States District Judge